UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

STEVEN WILLIAM DEUMAN, JR.,

        Movant,

v.                                                                      Case No. 1:15-CV-1027
                                                                        (Criminal Case No. 1:11:CR:266)

UNITED STATES OF AMERICA,

        Respondent.                                HON. GORDON J. QUIST

_____/

## OPINION

Movant, Steven William Deuman, Jr., has filed a Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, or Correct Sentence By a Person in Federal Custody. Deuman alleges that, for a number of reasons, his trial counsel was ineffective. The Government has filed a response, as well as an affidavit from Deuman's trial counsel, and Deuman has filed a reply. In addition, Deuman filed a supplemental reply, to which the Court allowed the Government to file a response. After reviewing the motion and briefs, the Court concludes that Deuman's arguments are without merit and he is not entitled to relief.

### I. PROCEDURAL HISTORY

On September 15, 2011, a grand jury returned a two-count Indictment against Deuman, charging him with first-degree murder and aggravated sexual abuse of a minor child who had not attained the age of twelve years, in violation of 18 U.S.C. §§ 1111(a) and 2241(c). On September 19, 2012, at the conclusion of an eight-day trial, a jury convicted Deuman on both counts. On March 8, 2013, this Court sentenced Deuman to life in prison on each count. (Case No. 1:11-CR-266 ECF No. 157 (the criminal docket will be referred to herein as "CC").)

Deuman appealed his sentence to the United States Court of Appeals for the Sixth Circuit, which affirmed in an unpublished opinion dated June 11, 2014. *United States v. Deuman*, 568 F. App'x 414 (6th Cir. 2014). Deuman filed a petition for writ of certiorari to the United States Supreme Court, which denied his petition on October 6, 2014. (CC ECF No.173.) Deuman thereafter filed this timely motion under § 2255.

## II. FACTS

The following facts were recited by the Sixth Circuit in its unreported opinion:

Deuman and Natasha Maitland had two children: a two-year-old son, S.D., and 15-week-old daughter, E.D. They lived in a trailer with Deuman's brother, Silvano Southbird, and Southbird's family. Deuman and Southbird were members of the Grand Traverse Band of Ottawa and Chippewa Indians. Southbird owned the trailer, which was located within Indian country in Sutton's Bay, Michigan. Ten people lived in the trailer; Deuman, Maitland, and their two children shared one room.

On the night of August 11, 2011, Maitland and Deuman had sex using a condom. Afterwards, Deuman tied the used condom in a knot and tossed it on the floor beside the bed. The next morning, Maitland woke up early for work and cleaned the room. She picked up the used condom, its wrapper, and a soiled diaper off the floor, and threw them away in the kitchen trash can. Maitland then placed a box of condoms on the nightstand next to the bed. She did not shower that morning because the water heater was broken.

Deuman was unemployed and stayed home to care for E.D. He knew that Maitland was scheduled to work until 7:00 p.m. that evening. At 6:49 p.m., Deuman sent Maitland the first of two text messages; both messages asked Maitland where she was. Deuman called Maitland at 7:05 p.m., and told her to call him back after she picked up her paycheck from her second job. Maitland did so at 7:35 p.m., and told Deuman to meet her at the tribal gas station so that she could pay to fill his motorcycle with gas. Deuman told Maitland to call back when she neared the gas station, which was a five-to-ten minute drive from the trailer. Deuman then went outside to smoke a cigarette with Southbird and his wife, Veronica Reynaga.

Maitland called back at 7:45 p.m. Deuman answered while smoking outside the trailer. He asked Southbird and Reynaga to watch E.D. while he went to meet Maitland at the gas station. Before he left, Deuman told Southbird and Reynaga that he was going to check on E.D. (something he normally did not do). Deuman went into the trailer, quickly returned, and said that something was wrong with E.D. Deuman led Southbird to the bedroom, where E.D. lay on the bed, motionless. Deuman explained that earlier he had left E.D. in the middle of the bed with a bottle, surrounded by blankets and pillows; and that when he walked into the room just

2

then, he found E.D. on the floor, by the foot of the bed.  Southbird told Deuman that they needed to take E.D. to the hospital, immediately.

At 7:47 p.m., Deuman called Maitland and said "get home now; get home now."  As Maitland arrived home three minutes later, she saw Southbird's car pulling out of the driveway, headed towards Traverse City.  Maitland pulled up to the trailer.  Deuman exited Southbird's car with E.D.'s lifeless body in his hands.  Maitland checked for a pulse, but found none.  E.D. was blue, cold to the touch, and had a line of blood running from her mouth to her forehead.

Maitland called 911 immediately after learning that neither Deuman or Southbird had done so.  Deuman grabbed the phone from Maitland and yelled at the dispatcher: "[E.D.] was sleeping on the bed, I laid her on the bed to sleep, she's not at the point of rolling over, she's three months old, I went to check on her, we were outside maybe ten minutes.  And I go in and she is unconscious."

Maitland told Reynaga to drive her and E.D. to the hospital.  As they drove there, the 911 dispatcher told Maitland to pull to the side of the road and wait for an ambulance.  Reynaga pulled over and Maitland gave CPR to E.D. on the side of the road.  A paramedic arrived and also attempted CPR.   An EMT then arrived and directed that E.D. be put into the ambulance.  The EMT then inserted a breathing tube into E.D.'s throat.  He observed that E.D.'s airway appeared deformed: instead of having a normal V-shape like other infants he had treated during his 24-year career, E.D.'s throat tissues had been pulled away, widening her throat to more of a U-shape.  The paramedics drive E.D. to the hospital.

Meanwhile, Deuman had stayed at the trailer.  He called out: "Oh, God, please don't let this happen to me."  Southbird told his brother that he should have gone to the hospital with E.D., and gave Deuman $16 to fuel his motorcycle.  Deuman went to the gas station and filled his gas tank.  Then he went inside the gas station and filled out a tribal-discount form, which saved him 76 cents.

When Deuman arrived to [sic] the hospital, he yelled at the paramedics, "[y]ou killed my fucking mom and now you killed my baby, too."  An emergency room doctor asked Deuman to explain what happened to E.D.  Deuman responded that he had gone back into the bedroom after a smoke "and the baby was on the floor with blood around its nose."

At 8:50 p.m., a doctor pronounced E.D. dead.  Soon after, the hospital allowed Maitland and Deuman to see E.D.'s body in the trauma room.  As they sat alone with their dead baby, Deuman whispered to Maitland that he had found a condom in E.D.'s mouth.  He had not told this fact to Southbird, the 911 dispatcher, or the paramedics and doctors.

The next day, Dr. David Start performed an autopsy on E.D.'s body.  He concluded that the cause of E.D.'s death was asphyxiation from a foreign object blocking her airway.  Start found no evidence that E.D. had fallen from the bed; and he determined that it was "not a reasonable possibility" that the three-month-old E.D. could have grasped a condom, placed it in her mouth, and sucked it in far enough to block her airway.  Start concluded that E.D.'s death was a homicide.  He further determined that E.D.'s death was consistent with an adult penis having been put in her mouth and blocking her airway, and that the oral penetration would not necessarily have resulted in physical trauma to E.D.'s mouth.

3

Twenty-eight hours after E.D.'s death, the FBI searched the trailer. On the bedroom floor, the FBI found a used condom beneath a dirty diaper and several condom wrappers. The box of condoms was on the bed. A forensic scientist discovered a sizable blood stain on the carpet next to the head of the bed, which later proved to be a mixture of bloody fluid from E.D.'s lungs.

Later that day, FBI agents Robert Birdsong and Larry Stewart interviewed Deuman. He told them that E.D. had been healthy the day that she died. Deuman also said that E.D. was unable to hold a bottle by herself or grasp an item unless it as put in front of her. According to Deuman, he put E.D. in the center of the bed with a bottle, and surrounded her with blankets and pillows so that she could not roll off. Then he went outside to smoke a cigarette. Two-to-seven minutes later he heard E.D. cry. He got a "bad feeling," and went to check on her. He found E.D. lying face down on the floor by the head of the bed. He picked her up and found an unrolled condom in her mouth and blood on her lips. At that point, Agent Birdsong asked Deuman how E.D. could have ended up on the floor with a condom in her mouth. Deuman responded: "if you're accusing me of sticking my dick in her mouth, then you're a sick mother-fucker." At that point, no one had yet suggested to Deuman that he had done anything of the sort.

On August 16th, Birdsong met with Maitland and Deuman. Birdsong told them that E.D. died of asphyxiation. Deuman then asked whether there was any damage to E.D.'s mouth. Birdsong responded that there was none. Deuman placed his head in his hands, and exclaimed, "[t]hank God." Deuman also asked whether any fluids had been found in E.D.'s mouth. Birdsong responded that they were still awaiting the test results.

Later that evening, Deuman and Maitland visited Deuman's aunt, a member of the Grand Traverse Tribe. Deuman told his aunt that E.D. had rolled off the bed and that Deuman had found her unconscious. His aunt said that the story did not make sense, and that perhaps E.D.'s death could be explained by "bear walking"—*i.e.*, there were good families and bad families, and the bad families were bear walkers, who could shape-shift into bears. Bear walkers could also take a person's DNA and become that person.

The next day, Agents Birdsong and Fred Berry, and Detective Richard Campos (Tribal Police) drove Deuman to Flint for a polygraph examination. During the drive, Deuman told the agents that E.D. had communicated to him when he saw her body at the funeral home. E.D. supposedly said that everyone should leave the trailer because it was haunted by evil spirits. On the drive home after the polygraph, Deuman said that he thought it as possible that he had killed E.D. while being bear-walked by one of the evil spirits. Deuman also said that there was a "50 percent" chance that he would be able to tell them what actually happened to E.D., an estimate he revised to "70 percent," and ultimately to "80 percent." But first he wanted to talk to Maitland. The agents dropped Deuman off at the hotel where he and Maitland were staying.

Deuman took Maitland out to the hotel's golf course for a talk. He told her that he blacked out the day that E.D. died, and that he thought he had been bear-walked.

A forensic analyst tested the used condom found on the bedroom floor. On

the outside of the condom she found DNA only from E.D. On the inside was DNA from both Maitland and Deuman. A forensic expert later explained that Maitland's DNA could have been transferred to Deuman's penis when the two had sex the night before.

The FBI arrested Deuman on August 18.

*Deuman*, 568 F. App'x at 416–18.

## III. DISCUSSION

Pursuant to 28 U.S.C. § 2255(a), a prisoner in the custody of the United States may seek collateral relief from a sentence where "the sentence was imposed in violation of the Constitution or laws of the United States, or . . . the court was without jurisdiction to impose such sentence, or . . . the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." A "[s]ection 2255 [motion] is not a substitute for a direct appeal, and thus a defendant cannot use it to circumvent the direct appeal process." *Regalado v. United States*, 334 F.3d 520, 528 (6th Cir. 2003) (citing *United States v. Frady*, 456 U.S. 152, 167-68, 102 S. Ct. 1584, 1594 (1982)). However, ineffective assistance of counsel claims are generally not reviewable on direct appeal, but instead must be raised in a motion under § 2255. *United States v. Quinlan*, 473 F.3d 273, 280 (6th Cir. 2007) (citing *Massaro v. United States*, 538 U.S. 500, 504, 123 S. Ct. 1690, 1693 (2003)).

A court must grant a hearing on a § 2255 motion "[u]nless the motion and the files and records of the case show that the prisoner is entitled to no relief." 28 U.S.C. § 1155(b). A hearing is not required if the movant's allegations "cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Valentine v. United States*, 488 F.3d 325, 333 (6th Cir. 2007) (internal quotation marks omitted). A district judge who conducted the underlying trial that is the subject of a § 2255 motion "may rely on his or her memory of the trial when relevant to issues on collateral review." *Smith v. United States*, 348 F.3d 545, 554 (6th Cir. 2003).

## A.      Ineffective Assistance of Counsel

Deuman argues that his trial counsel, Richard Stroba, an experienced Assistant Federal Public Defender, was ineffective for several reasons. First, Deuman argues that his counsel was ineffective for failing to present an alternative timeline focusing the jury on a time of death of 7:19 p.m. and an alternative theory that the Southbird children were responsible for E.D.'s death. (ECF No. 1 at PageID.11.) Second, Deuman claims that his counsel was ineffective for failing to interview the Southbird children and Deuman's son, S.D., and for not hiring a child psychologist to facilitate the interview. (*Id.* at PageID.12, 34.) Third, Deuman argues that his counsel was ineffective for failing to call experts in the fields of pediatrics and DNA analysis, for failing to call Dr. Houghton, who determined the time of death, and for failing to cross-examine Dr. Debra Simms more thoroughly. (*Id.* at PageID.13–14.) Finally, Deuman alleges cumulative error based on a laundry list of errors by counsel. (*Id.* at PageID.15.)

Ineffective assistance of counsel claims are analyzed under the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052 (1984). First, a defendant must show deficient performance—his "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687, 104 S. Ct. at 2064. A defendant must show that "counsel's representation fell below an objective standard of reasonableness" measured by "prevailing professional norms." *Id.* at 688, 104 S. Ct. at 2064–65. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." *Bell v. Cone*, 535 U.S. 685, 702, 122 S. Ct. 1843, 1854 (2002) (internal quotation marks omitted). Review of counsel's performance must thus be "highly deferential," and the court must avoid the temptation "to second-guess counsel's assistance after

conviction or adverse sentence." *Strickland* 466 U.S. at 689, 104 S. Ct. at 2065. *See also United States v. Valerio*, 676 F.3d 237, 248 (1st Cir. 2012) (noting that "Monday morning quarterbacking of trial tactics . . . is insufficient to sustain an ineffective assistance of counsel claim" (internal quotation marks omitted)). Moreover, a defendant's burden of overcoming the general presumption is even greater when counsel's conduct involves "strategic decisions," which are viewed as "virtually unchallengeable." *Logan v. United States*, 434 F.3d 503, 510 n.1 (6th Cir. 2011).

Second, the defendant must demonstrate prejudice, that is, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result . . . would have been different." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding." *Moreland v. Robinson*, 813 F.3d 315, 329 (6th Cir. 2016) (quoting *Harrington v. Richter*, 562 U.S. 86, 104, 131 S. Ct. 770, 787 (2011) (quoting *Strickland*, 466 U.S. at 693, 104 S. Ct. at 2067)). Rather, "[c]ounsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Harrington*, 562 U.S. at 104, 131 S. Ct. at 787–88 (quoting *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064)). A court may deny an ineffective assistance claim solely on the prejudice prong if lack of prejudice is apparent. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.

### 1. Counsel was not ineffective for not presenting an alternative theory.

The government's theory at trial was that Deuman asphyxiated E.D. before 7:00 p.m., likely before Southbird and Reynaga returned to the trailer around 6:45 p.m. (CC ECF No. 168 at PageID.3298.) Deuman's attorneys maintained that, although E.D. died from asphyxiation, her death was accidental and not a homicide. (ECF No. 17 at PageID.164.) This defense focused on the lack of trauma and the state of Deuman's and Maitland's bedroom in the trailer as an "accident

waiting to happen, and it did happen." (*Id.*) The time of E.D.'s death was not particularly germane to the accidental death defense.

Deuman argues that his counsel was ineffective for failing to present a different, or perhaps additional, theory premised on the following: (1) the time of death, as shown on a death certificate, was 7:19 p.m.; (2) Deuman's phone records show that he could not have been inside the trailer between 7:05 p.m. 7:45 p.m.; and (3) counsel should have argued that the children (the Southbird children and/or S.D.) were responsible for E.D.'s death. Deuman also argues that because E.D.'s body showed no signs of bruising/lividity, E.D. could not have died before the Southbird family returned home around 6:45 p.m., as the Government argued at trial.[1] (ECF No. 1 at PageID.11, 23–29.)

Deuman's argument lacks merit. First, contrary to Deuman's assertion, even if no cell phone reception was possible inside the trailer, Deuman's cell phone records do not show that Deuman was outside the trailer the entire time between 7:05 and 7:45 p.m. and thus incapable of committing the murder. There was ample time between phone calls for Deuman to have been in the trailer with E.D. Thus, the phone records do not show what Deuman claims. Second, the defense that Deuman now claims his counsel should have presented would have been at odds with Deuman's prior statements to investigators, family members, and others. The range of defenses available to counsel was hemmed in tightly by Deuman's story that he laid E.D. on the bed, went outside to smoke a cigarette, and, when he returned to the bedroom a short time later, found E.D. on the floor. Deuman

---

[1]In his reply, Deuman argues that there were actually six potential scenarios that counsel could have presented to the jury. Deuman should have raised this argument in his § 2255 Motion and supporting brief. It is well-established that a party, including a movant in a motion under § 2255, may not raise an argument for the first time in a reply brief. *See Burrell v. United States*, No. 16-CV-14297, 2017 WL 1295527, at *2 (E.D. Mich. Mar. 2, 2017) (stating that because the petitioner waited to raise his ineffective assistance of counsel argument until he filed his reply brief, fairness required that the argument be deemed waived); *United States v. McCorkle*, No. 1:07-CR-288, 2010 WL 2131907, at *7 (W.D. Mich. Mar. 30, 2010) (noting that "[g]enerally, it is well established that a party may not present a new claim, defense, argument, or theory in a reply brief").

found E.D. sometime between 7:45 p.m. and 7:47 p.m., when he called Maitland telling her to "get home now." Deuman's various statements established that he was outside for only a short time—at longest, fifteen minutes, and as briefly as two minutes. (ECF No. 25-1 at PageID.224 (telling 911 operator that he was outside "maybe ten minutes"); CC ECF No. 164 at PageID.2488 (telling a hospital security guard that he went outside to smoke and came "back in 10 minutes and the baby was on the floor"); CC ECF No. 163 at Page ID.2293–94 (telling his aunt that he "went outside for two to seven minutes to smoke a cigarette"); CC ECF No. 164 at PageID.2521–22 (telling tribal officer that he was out smoking a cigarette "[m]aybe 15 minutes, tops").) Similarly, Deuman's statements to investigators ruled out other people as having caused E.D.'s death. Deuman said that S.D. followed him when he went outside to smoke a cigarette and that Southbird and his daughters also went outside. (CC ECF No. 165 at Page ID.2868–69.) Deuman said that no one was in the bedroom with E.D. when he went outside. (*Id.* at PageID.2869.) Deuman also told investigators that he did not think that anyone else—his brothers, Reynaga, or the Southbird children had anything to do with E.D.'s death. (*Id.* at PageID.2880.) Thus, in light of all of the available evidence, counsel exercised reasonable and informed professional judgment to argue that E.D.'s death was an accident and not to present a defense that was contrary to Deuman's own version of events. *See Poindexter v. Mitchell*, 454 F.3d 564, 573–75 (6th Cir. 2006) (counsel was not ineffective for not presenting a "crime of passion defense," which would have been inconsistent with the defendant's continued insistence that he did not shoot the victim); *Lucero v. Lemaster*, 131 F. App'x 636, 638 (10th Cir. 2005) (counsel was not ineffective for not trying to refute that the defendant perpetrated the homicide because doing so would have required the defendant to take the stand and repudiate

his own inculpatory statements to the police).[2]

Contrary to Deuman's assertion, defense counsel did focus on the lack of trauma to E.D.'s mouth and throat, both during cross-examination and in arguments to the jury. (CC ECF No. 165 at PageID.2787–88 (examining Dr. Start about the lack of findings of trauma or injuries to E.D.).) In particular, the Government's expert, Dr. Simms, testified on cross-examination that she would expect to see injury accompanying oral-penile contact in the case of an infant if excessive force were used. (CC ECF No. 167 at PageID.3103–04.) Defense counsel presented this evidence to provide the jury an alternative explanation for E.D.'s asphyxiation. The instant case is distinguishable from *Pavel v. Hollins*, 261 F.3d 210 (2d Cir. 2001), and other cases Deuman cites for the proposition that counsel's failure to prepare any defense constitutes deficient performance. Exercising reasonable professional judgment in light of the known facts, Deuman's counsel presented the defense with the best chance of success. Thus, contrary to Deuman's argument, counsel presented an alternative, coherent theory for the jury to consider.

Deuman also argues that counsel was ineffective for failing to use an EMT report to impeach testimony by EMT Michael Sheets that E.D.'s throat appeared unusual because it widened to more of U-shape rather than having a normal V-shape like he had observed in other infants. (ECF No. 1 at pageID.31–32.) Deuman argues that counsel should have impeached Sheets with the report because it says nothing about the ease of intubation or U-shaped vocal cords. This argument lacks

---

[2]In his reply, Deuman argues that most of the harmful statements attributed to him were set forth in FBI 302 reports and that counsel should have argued that such reports were false and that Deuman's initial statement to law enforcement that he was gone for only a few minutes was mistaken. (ECF No. 29 at PageID.261–62.) These arguments are frivolous. As set forth above, although the details of Deuman's story varied when he told it to different individuals, *e.g.*, whether he gave E.D. a bottle when he laid her on the bed and the time he was outside (from two to fifteen minutes), his basic claim was that he was outside for only a brief time—at longest, fifteen minutes. Deuman's inconsistent statements were made to many others who were not FBI agents or law enforcement officers. Certainly Deuman's counsel was not required to suggest to the jury that Deuman was really a liar when he propagated his "I was gone only for a brief time to smoke a cigarette" story to numerous individuals.

merit because the report Deuman cites was prepared by someone other than EMT Sheets and, thus, would have been of little use in impeaching EMT Sheets.[3]  (ECF No. 1-1 at PageID.83.)

Finally, as attorney Stroba notes in his affidavit, determining the exact time of death is a speculative endeavor.  In fact, there were two different death certificates that listed different times of death.  (ECF No. 17 at PageID.164.)  Moreover, the Government presented evidence that E.D. had been dead at the time Deuman claims to have found her in the bedroom.  (CC ECF No. 163 at PageID.2361–62, 2412–13.)  Deuman's assertion that the evidence conclusively shows that the time of death was after 7:00 p.m. is nothing more than unsupported speculation.

Accordingly, Deuman fails to show both that his counsel's performance was deficient or that counsel's performance prejudiced Deuman's defense.

### 2. Counsel was not ineffective for failing to interview the children and call them as witnesses.

Deuman argues that counsel was ineffective for failing to interview the Southbird children, who were two, four, and five years old, and Deuman's son, S.D., who was two years old, and to call them as witnesses.  "While counsel has a 'duty to make reasonable investigations,' this includes the duty 'to make a reasonable decision that makes particular investigations unnecessary.'" *Poindexter*, 454 F.3d at 564 (quoting *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066).  Counsel's "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998) (internal quotation marks omitted).

In his affidavit, attorney Stroba states that the defense team received recordings of forensic interviews of the two eldest Southbird children and concluded that "[t]he children provided little

---

[3]In any event, Deuman's counsel effectively undermined Sheet's testimony about E.D.'s U-shaped vocal cords when, during his closing argument, he pointed out that Dr. Start did not make a finding upon examination that E.D. had U-shaped vocal cords.  (CC ECF No. 188 at PageID.3338.)

intelligible information and appeared too immature to communicate much information in any manner." (ECF No. 17 at PageID.17.) Because the interview provided "[n]othing useful," the defense team decided to look elsewhere for a defense, settling on the accident defense presented at trial. Nothing about the decision not to make efforts to interview the Southbird children, or to interview S.D., who was only two years old, was unreasonable given what the defense team learned from the recorded forensic interviews. All of these children were very young and it was unlikely that they would be able to provide any pertinent details for a defense. Moreover, attorney Stroba states that the defense team attempted to interview the parents, Southbird and Reynaga, but they refused to speak with defense counsel's investigator. (*Id.*) Counsel's decision not to investigate further, particularly in light of Deuman's statements setting the timeframe and denying others' involvement, was reasonable.

Deuman also argues that counsel should have retained a child psychologist to interview the children, but he offers nothing other than unsupported speculation that such efforts would produce anything meaningful. In short, Deuman fails to show that counsel was ineffective for not interviewing the children. Moreover, Deuman cannot show a reasonable probability that the result of the trial would have been different had counsel retained a child psychologist to interview the children.

3.    **Counsel's decisions regarding witnesses were strategic decisions and, in any event, reasonable.**

Deuman argues that his counsel was ineffective based on counsel's decisions regarding various witnesses. "[T]he decision of which witnesses to call is quintessentially a matter for the trial attorney." *Boyle v. McKune*, 544 F.3d 1132, 1139 (6th Cir. 2008); *see also Unites States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005) ("[A] lawyer's decision to call or not to call a witness is a strategic decision generally not subject to review. The Constitution does not oblige counsel to

12

present each and every witness that is suggested to him." (citations and internal quotation marks omitted)).

### a. *Pediatrics Expert*

Deuman argues that his counsel should have called a pediatrics expert to rebut testimony by the Government's expert, Dr. Simms, that an oral rape of an infant could cause death without causing injury or leaving evidence of trauma. In fact, counsel had a pediatrics expert—Dr. Stephen Guertin—lined up to testify, but the morning he was to testify, Dr. Guertin informed counsel that he was backing out of his commitment to testify. (ECF No. 17 at PageID.165.) Dr. Guertin advised counsel that had the Government asked him about Deuman's criminal history, he would have opined that Deuman likely committed the offense. (*Id.*) Instead of seeking a continuance to try to find a new expert, counsel decided to rely on Dr. Dragovic as his sole witness. (*Id.*)

Deuman argues that counsel should have sought a continuance in order find a new pediatric expert who could "clarif[y] for the jury the difference between deep penetration with associated trauma and a criminally sufficient sexual abuse due to a minimal contact-event but without associated trauma." (ECF No. 1 at PageID.22.) Deuman's argument fails because his counsel made a reasonable decision to rely on Dr. Dragovic. Counsel aptly concluded that it was unlikely that the Court would grant a continuance to allow the defense time to find a new pediatric expert. Such is a strategic decision not open to challenge. In addition, through cross-examination of Dr. Simms, counsel effectively established that trauma would be expected in some cases of penile-oral contact. *See Harrington*, 562 U.S. at 111, 131 S. Ct. at 791 (noting that "[i]n many instances cross-examination will be sufficient to expose defects in an expert's presentation" and [w]hen defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict"). Finally, Deuman fails to show that another expert would

have been available to provide the desired testimony.  Accordingly, Deuman's argument fails on both *Strickland* prongs.

### b. *Dr. Houghton*

Deuman argues that counsel should have called Dr. Houghton—the medical examiner who completed the death certificate—or introduced the death certificate into evidence to show that E.D.'s death occurred at 7:19 p.m.  This argument lacks merit because counsel reasonably concluded that calling Dr. Houghton might do more harm than good to the case—he likely would have been biased toward the Government and may have bolstered Dr. Start's testimony.  In addition, Dr. Houghton may well have testified—consistent with the Government's theory—that E.D. could have died much earlier than indicated on the death certificate.  Moreover, as set forth above, the defense that counsel presented depended not on the time of E.D.'s death, but on how the death occurred.  As such, neither the death certificate nor Dr. Houghton's testimony would have been particularly helpful to the defense.  Thus, Deuman's argument fails on both *Strickland* prongs.

### c. *DNA Expert*

Finally, Deuman argues that counsel was ineffective for not presenting a DNA expert.  The Government presented evidence that Deuman's and Maitland's DNA was found on the inside of the condom and only E.D.'s DNA was found on the outside of the condom.[4]  (CC ECF No. 165 at PageID.2831–37.)  Deuman argues that a DNA expert could have explained that the condom found under the diaper was the same condom Deuman had put on inside out several nights before, on August 6, and removed and discarded in the space near the head of the bed.  Deuman says that such testimony would have provided the jury an explanation for the reason Maitland was the donor of the

---

[4]The presence of Maitland's DNA inside the condom is explained by testimony that her DNA could have been on Deuman's penis and rubbed off in the condom when he used it.  (CC ECF 165 at PageID.2836.)  The lack of any of Maitland's DNA on the outside of the condom is evidence that Deuman did not use this particular condom to have sex with Maitland.

majority of the DNA on the inside of the condom. (ECF No. 1 at PageID.43.) Deuman claims that the DNA expert could have tested the condom for DNA degradation to show that his DNA was left on the condom at least 5-6 days prior to E.D.'s death. (*Id.* at PageID.43–44.)

Regarding DNA evidence, attorney Stroba states that he consulted with Professor Ron Bretz, of Cooley Law School, who has taught and written extensively on the subject of DNA evidence. Based on his consultations with Professor Bretz, attorney Stroba concluded that the DNA evidence, which showed Maitland's DNA on the inside of the condom, was consistent with the defense theory that E.D. ingested a condom that Deuman had previously used. (ECF No. 17 at PageID.165–66.) Attorney Stroba notes that this evidence, as well as the lack of trauma, supported the defense's claim of an accidental ingestion. (*Id.* at PageID.166.)

Deuman's argument fails for a number of reasons. First, counsel's decision not to retain a DNA expert was certainly reasonable, particularly given that the Government's DNA evidence was consistent with the defense theory. Second, Deuman's new theory does not explain why only E.D.'s DNA was found on one side of the condom and Deuman's and Maitland's DNA was found on the other side. Third, Deuman's statement in his affidavit that he and Maitland "last had sex on either August 6th or 7th" (ECF No. 1 at PageID.103), is simply not credible in light of Maitland's testimony, and Deuman's prior inconsistent statement, that they had sexual intercourse on August 11, the night before E.D. died. Finally, Deuman offers nothing other than his self-serving, after-the-fact affidavit to support his claim that the condom found in the trailer was the condom that he allegedly put on inside out on August 6 or 7.

### 4. There was no cumulative error based on ineffective assistance.

Last, Deuman cites numerous alleged failures by his counsel that he claims amount to cumulative error. "[M]ultiple errors by trial counsel can cumulatively result in a Sixth Amendment

violation." *Thomas v. United States*, 849 F.3d 669, 679 (6th Cir. 2017) (citing *Campbell v. United States*, 364 F.3d 727, 736 (6th Cir. 2004)). However, many of the alleged failures—such as Deuman's assertion that Clare Freeman, of the Federal Public Defender's office, is not an attorney—are frivolous; most, if not all, are unsupported with evidence or refuted by the record; and none of them shows deficient performance. Because Deuman fails to show any error by his counsel, "there are no attorney errors to accumulate." *Porter v. United States*, No. 2:11-cv-311, 2015 WL 1033881, at *11 (E.D. Tenn. Mar. 9, 2015). For the same reason, and even if counsel's performance was deficient in any respect, Deuman cannot show prejudice—a substantial likelihood that the result would be different. *Harrington*, 562 U.S. at 112, 131 S. Ct. at 792. Counsel's asserted failures merit only brief discussion.

### a. *Maitland*

Deuman argues that counsel should have: (1) cross-examined Maitland about being a "Spirit Medium" and "witch"; (2) asked her about S.D. being held by Child Protective Services (CPS) after E.D.'s death; (3) asked her about a letter an attorney sent to the Federal Public Defender's office asking that she not be interviewed; and (4) showed her a photo of the messy bedroom and cross-examined her about the day the second box of condoms was purchased. Deuman offers no evidence that Maitland was a "Spirit Medium" and "witch" and fails to explain why such would be relevant to impeachment. The same is true for the letter from the attorney. As for CPS taking E.D., broaching the issue with Maitland may have caused the jury to be more sympathetic to Maitland. This was a matter of trial strategy. Finally, counsel did introduce photos of the bedroom during Maitland's testimony and asked her about the two different types of condom wrappers. (CC ECF No. 163 at PageID.2304–07.)

### b. *Reynaga and Southbird*

Deuman argues that counsel should have: (1) impeached Southbird with his past convictions; (2) cross-examined Southbird and Reynaga about being coerced into making statements because CPS had taken their girls; (3) cross-examined Southbird about a stress-induced stroke; and (4) promptly interviewed Southbird and Reynaga before they could switch to the government's side. Deuman fails to provide any information on Southbird's alleged convictions or explain why they would be admissible, counsel did elicit testimony from Southbird and Reynaga about their children being taken away by CPS (CC ECF No. 162 at PageID.2126, 2155–56), Deuman does not explain how Southbird's alleged stroke would be relevant for impeachment, and the defense team did attempt to interview Southbird and Reynaga early in the case, without success.

### c. *Cindy and Paul Deuman*

Cindy Deuman, Deuman's mother, and Paul Deuman, Deuman's brother, were called as witnesses by the Government. Deuman argues that counsel should have: (1) performed a correct cross-examination of Cindy Deuman and Paul Deuman; (2) asked Paul Deuman about being investigated for attempting to steal Deuman's "per cap money"; and (3) asked Cindy Deuman about her history of animus toward Deuman. First, Deuman fails to offer evidence supporting his claim that Paul Deuman was being investigated. Second, on cross-examination, defense counsel attempted to get Cindy Deuman to admit that Deuman could not have completed a prior residential sexual therapy program without admitting that he had sexually abused the two girls. Finally, counsel did elicit evidence from both Cindy Deuman and Paul Deuman that was helpful to the defense case. The fact that counsel could have questioned the witnesses about other issues or events does not mean that counsel's performance was deficient. *See Coe*, 161 F.3d at 342 (stating that "although there are things that Coe's lawyer could have done better, Coe has not convinced us that his lawyer did not

17

function adequately at trial, or that the trial produced an unjust result"); *Martin v. Jabe*, 747 F. Supp. 1227, 1233 (E.D. Mich. 1989) ("Our Constitution does not place a standard of perfection upon a defense counsel.").

### d. *Sexual Misconduct Witnesses*

Deuman argues that counsel should have called certain witnesses or introduced certain records to impeach S.M.P. and A.K.P.—the witnesses who testified about Deuman's prior sexual abuse. However, Deuman fails to support this argument with statements from such witnesses or records indicting what such evidence would have shown, nor does Deuman indicate that counsel was aware of such evidence. Moreover, counsel effectively cross-examined S.M.P. about her memory of the abuse, her prior inconsistent statements, drug use requiring placement in treatment programs and resulting in memory loss, and a statement that she made on MySpace. (CC ECF No. 166 at PageID.3028–41.) Counsel made similar points on cross-examination of A.K.P. (*Id.* at PageID.3061–68.) Thus, Deuman fails to show that counsel's performance in examining S.M.P. and A.K.P. was deficient.

### e. *Law Enforcement Witnesses*

Deuman argues that counsel was ineffective in examining law enforcement witnesses. First, he argues that counsel should have established with Tribal Detective Kobe Amore that Amore was "the first person to calmly interact with the defendant and ask for a recounting of the incident," and Deuman told Amore about the condom in E.D.'s mouth. (ECF No. 1 at PageID.57.) But this is inaccurate, as Dr. Kevin Omilusik—an emergency room physician—spoke with Deuman at the hospital and asked him for information about what happened to E.D. (CC ECF No. 164 at PageID.2476.) Deuman did not tell Dr. Omilusik about the condom he found in E.D.'s mouth. (*Id.* at PageID.2479.)

Deuman argues that counsel should have questioned the FBI agents about their continued interrogation of Deuman after he asked for a lawyer during a non-custodial interrogation. Deuman does not suggest that his counsel should have filed a motion to suppress, nor has he shown that counsel had a valid basis to assert a *Miranda* violation. Moreover, Deuman has not shown why counsel's failure to question the agents about the continued interrogation constituted deficient performance, rather than trial strategy, particularly in light of defense counsel's efforts to portray Deuman as being cooperative in the investigation and having nothing to hide. (CC ECF No. 165 at PageID.2889–902.)

Deuman also argues that counsel should have impeached the agents' credibility with a recording of a phone call between Deuman and Faith McGruther, in which McGruther claims that the FBI told her that E.D. was beaten and bruised, contrary to the physical evidence. However, Deuman fails to support his argument with a copy of the recording or an affidavit from McGruther and, in any event, counsel demonstrated through other witnesses that the FBI made at least one false statement during the investigation. (*Id.* at PageID.2908.) Finally, Deuman has not shown that any false statement by the FBI caused any witness to change testimony.

### f. *Margaret Boyle*

Deuman argues that counsel was ineffective for not calling Margaret Boyle to testify that she examined E.D. and saw no evidence of beating, bruising, sexual abuse, or trauma to the mouth and to testify that she told Deuman about "bear walking." However, neither issue was in contention at trial, and her testimony would have been merely cumulative. Thus, counsel was not ineffective for not calling Boyle.

### g. *Other Issues*

Deuman argues that his counsel was ineffective for: (1) failing to have Deuman testify in his own defense; (2) failing to request a second bond hearing; (3) having Deuman waive his preliminary

examination; (4) stipulating that Deuman was a native in Indian Country; (5) failing to object to the instruction that the jury need not find that Deuman had the premeditated intent to kill E.D. in order to prove the first count of aggravated sexual abuse resulting in death; (6) failing to move for a change of venue in response to a prospective juror's statement; (7) failing to object to the Government's characterization of Deuman's penis as being the size of a hot dog and failing to use "flesh props" to demonstrate the difference in size between an adult penis and a 15-week old's mouth and throat; (8) failing to object that there were no Native Americans in the venire; (9) failing to anticipate the jury's additional scientific questions; (10) failing to argue a Rule 29 motion; and (11) failing to advise Deuman to take a plea. (ECF No. 1 at PageID.59–61.)

The foregoing arguments lack merit. First, the Court questioned Deuman under oath about testifying, and Deuman confirmed that he did not want to testify and said that no one was forcing him to make that decision. (CC ECF No. 168 at PageID.3259.) Second, a second bond hearing is irrelevant to counsel's performance at trial. Third, counsel was not ineffective for waiving the preliminary hearing because the Government could have easily established probable cause. Fourth, counsel was not ineffective for stipulating that Deuman was a Native American or that the crime occurred in Indian Country because there was no non-frivolous defense to those issues. Fifth, counsel was not ineffective for failing to object to the jury instruction because it was a correct statement of the law. Sixth, counsel was not ineffective for failing to move for a change of venue or failing to object to the lack of Native Americans in the venire because such objections would have been meritless. *See Ludwig v. United States*, 162 F.3d 456, 459 (6th Cir. 1988) ("Counsel was not required to raise meritless arguments to avoid a charge of ineffective assistance of counsel."). Seventh, the Government did not portray Deuman's penis as the size of a hotdog, as Deuman suggests. Rather, the Government cited a hotdog as an example of a food that could block a young baby's airway. (CC ECF No. 167 at PageID.3227.) Moreover, defense counsel clarified with Dr.

Dragovic on re-direct the difference between a hotdog and an erect adult penis. (*Id.* at PageID.3242–43.) Thus, counsel had no need to object. Moreover, counsel cannot be deemed ineffective for not using potentially offensive "flesh props" when counsel made the same point through other means. Finally, defense counsel did make and argue a Rule 29 motion (CC ECF No. 167 at PageID.3171–3174), and submitted it in writing as well (CC ECF No. 123.), and Deuman fails to show that the Government ever made a plea offer.[5]

## B. Evidentiary Hearing

Based on the foregoing analysis, the Court concludes that an evidentiary hearing is not warranted. Therefore, the Court will deny Deuman's request for an evidentiary hearing.

### IV. NO CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. § 2253(c)(2), the Court must also determine whether a certificate of appealability should be granted. A certificate should issue if Deuman has demonstrated a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473, 120 S. Ct. 1595 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Deuman's claims under the *Slack* standard.

Under *Slack*, 529 U.S. at 484, 120 S. Ct. at 1604, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." The Court finds that reasonable jurists could not find that

---

[5]The Court has considered the cases and arguments set forth in Deuman's supplemental reply and concludes that they are meritless for the reasons already discussed herein. Thus, the Court need not separately address Deuman's additional arguments and cases.

this Court's dismissal of Deuman's claims was debatable or wrong.  Therefore, the Court will deny Deuman a certificate of appealability.

## **Conclusion**

For these reasons, Deuman's § 2255 Motion will be denied.  In addition, the Court will deny Deuman a certificate of appealability as to each issue raised because he has failed to make a "substantial showing of a denial of a constitutional right."

A separate order will issue.


Dated:  May 23, 2017                    _____/s/ Gordon J. Quist_____
                                                    GORDON J. QUIST
                                                    UNITED STATES DISTRICT JUDGE